IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
November 17, 2004 Session

## STATE OF TENNESSEE v. MARGIE JEANETTE FARLEY

**Direct Appeal from the Circuit Court for Warren County**
**No. F-8248     James L. Weatherford, Judge**

---

**No. M2003-02826-CCA-R3-CD - Filed February 16, 2005**

---

The defendant was convicted by a Warren County jury of facilitation of first degree felony murder, facilitation of especially aggravated robbery, and criminally negligent homicide, which the trial court merged into the facilitation of felony murder conviction. The defendant was sentenced as a Range I, standard offender to twenty-five years on the facilitation of felony murder conviction and twelve years on the facilitation of especially aggravated robbery conviction, to be served consecutively, for an effective sentence of thirty-seven years in the Department of Correction. On appeal, the defendant raises the following issues: whether the evidence was sufficient to sustain her convictions and whether the court erred by not instructing the jury as to accessory after the fact and in imposing consecutive sentences. Following our review, we affirm the judgments of the trial court but remand for entry of corrected judgments to reflect the correct offense date.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed and Remanded for Entry of Corrected Judgments**

ALAN E. GLENN, J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

Robert S. Peters, Winchester, Tennessee, for the appellant, Margie Jeanette Farley.

Paul G. Summers, Attorney General and Reporter; Michelle Chapman McIntire, Assistant Attorney General; Dale Potter, District Attorney General; and Larry Bryant, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### FACTS

Late in the evening on May 4, 2000, the defendant, Margie Jeanette Farley, and a codefendant, Braddie Eric Sullivan, went to the home of the victim, Louie B. Johnson, in Warren County. There, Sullivan beat the victim to death with a tire tool belonging to the defendant and one

of the codefendants took the victim's wallet from his pants. Sullivan and the defendant then fled to Florida in the defendant's vehicle. The defendant returned to Tennessee and was subsequently questioned by law enforcement officials. She was arrested on May 13, 2000, and she and Sullivan were charged by a Warren County Grand Jury in a three-count indictment with first degree felony murder, especially aggravated robbery, and first degree premeditated murder.

**Proof at Trial**

Testifying for the State, Wayne Millraney stated that he was at the victim's home between 6:00 and 7:00 p.m. on Thursday, May 4, 2000, and the victim was present and in apparent good health.

Mike McKinney testified that he went to the victim's home around 4:45 p.m. on Friday, May 5, 2000, to look at some dog boxes for sale and discovered the victim's body lying in the backyard. McKinney then walked to the nearby Delores Market and asked someone to call 9-1-1.

Warren County Sheriff's Deputy Jim Shules testified that he was dispatched to the victim's residence at 4446 Old Smithville Road. Upon arrival, he discovered the victim lying "towards the end of his driveway" and observed "marks in the driveway," as if "[s]omething had dug it up," as well as bloodstains. He then notified investigators, who took over the crime scene.

Herbert Rowland, the Chief Investigator for the Warren County Sheriff's Department, testified that he was dispatched to investigate the victim's death. He discovered the victim's boots near the bottom of the back porch steps and the victim's pants in the yard, both separate from the victim's body. The victim's trailer was locked, and Rowland did not see any signs of a break-in. About two days later, Rowland and other investigators walked Old Smithville Road and discovered a tire iron "perceived to be the murder weapon." About a mile from the victim's trailer, they found the victim's wallet, which did not contain any money, and a bandana. They also found some of the contents of the wallet strewn about the area.

As the investigators were trying to develop a suspect, the defendant's name "came up," so Rowland interviewed her at the Sparta Police Department on May 11, 2000. This interview with the defendant, who was not yet under arrest, was videotaped, and the videotape was played for the jury. During the interview, the defendant stated that the victim was her "sugar daddy" and he was worth more to her alive than dead. She said she was in Georgia and Florida with her friend, Sharon Wilson, on the day of the murder. She also stated that the last time she saw the victim was around Christmas of 1999, and the last time she spoke with him on the telephone was a week or two before his death. Although the defendant gave other statements to police, this first one was the only one that was videotaped.

Investigator Jackie Matheney, Jr., of the Warren County Sheriff's Department testified that the tire tool was recovered near 4281 Old Smithville Road, approximately two-tenths of a mile from

the victim's trailer. The tire tool was collected and sent to the crime lab. The tire tool, wallet, and bandana were all found "going back into town" from the victim's trailer.

Michael Turbeville, a forensic scientist in the Serology and DNA Unit of the Tennessee Bureau of Investigation ("TBI") Crime Laboratory in Nashville, testified that he was summoned to Warren County to help process the murder scene. The victim, clothed in a shirt and underwear, was found lying in the yard. His pants were located a few feet from his head, and his boots were found approximately thirty to thirty-five feet away from his body. At least two tire track impressions and one shoe track impression were made, but someone other than Turbeville analyzed those. Later, Turbeville examined the defendant's 1992 Buick Regal for blood and discovered that the carpet and upholstery apparently had been cleaned with "some kind of cleaning agent or some kind of chemical solvent," which "could have potentially destroyed any blood evidence that was present." He also discovered the victim's blood and hair on the tire tool submitted to the crime lab. No blood was found on the victim's wallet, personal papers, or the bandana. While taking inventory of the Buick Regal, he noted that the jack and the tire tool were missing from the vehicle.

Bobby Phipps, a corrections officer with the Cumberland County Sheriff's Department, testified that the codefendant, Eric Sullivan, was released from the Cumberland County Jail on May 3, 2000, at 2:50 p.m., after the defendant posted his bond.

Mark Eller, an acquaintance of the defendant, testified that he saw the defendant and Sullivan at Phillip Smith's house around 8:30 or 9:00 p.m. on May 4, 2000.

James Phillip Smith testified that the defendant and Sullivan came to his residence in Hickory Valley at Sparta around 1:00 p.m. on May 4, 2000, and gave him about two grams of methamphetamine to sell. Later that day, before dark, they returned to Smith's trailer and retrieved the methamphetamine, which Smith had been unable to sell. The defendant also took a shower at Smith's trailer. The defendant returned to Smith's trailer on May 11 and asked Smith to "give an alibi for her and [Sullivan]." Smith gave two statements to the police. In the first statement, on May 11, he provided an alibi; however, on May 12, he "went to the Sheriff's Department and asked to talk to the detectives" in order to "set the record straight." He admitted that he was not truthful in the first statement. When he saw the defendant on May 12, she had dyed her hair red. Smith said he, Sullivan, and the defendant had all used methamphetamine in the past, but on May 4, Sullivan and the defendant both appeared "pretty normal."

Andreas "Andy" Allen testified that he dated the defendant when he was a teenager and that they were "good friends." He stated that he had read the defendant's statements accusing him of the murder, but he could not have done it because he was incarcerated in the Washington County Jail on the day of the murder. The defendant wrote Allen a letter while he was in jail and asked him to admit to committing the murder because "[Sullivan] threatened to kill her kid and kill her mama and her family if she told anything on him." He believed the defendant "was in fear of her life when she wrote" the letter. On cross-examination, he stated that he flushed the letter from the defendant down the toilet before anyone could read it. He also testified that Sullivan had a violent reputation and had

-3-

"whipped five (5) deputies in Van Buren County out in the street." He acknowledged that the defendant had a history of violence and that she might commit a violent act if influenced by someone.

Melissa Knowles testified that she knew the defendant through school and "was married into her family." On May 4, 2000, the defendant came to visit Knowles because she was upset and "was having trouble with her boyfriend." About two days later, the defendant, accompanied by Sullivan, came to Knowles' house again to borrow some clothes because she was going on vacation to Georgia. Sullivan waited in the defendant's car while she borrowed the clothes, and the defendant introduced Sullivan to Knowles, saying, "This is my new boyfriend Eric." The defendant's hair was shorter than it was the last time Knowles saw her, and she had changed the color. After her vacation, the defendant returned to Knowles' home alone and said she had been fighting with Sullivan. The defendant began crying and said, "I can't talk to you about it. I just really can't talk about it. . . . Melissa, I don't want to get you into nothing [sic]." She stated the defendant seemed "very scared" of Sullivan and told her, "[I]t is bigger than what you think." On redirect, Knowles refreshed her memory with her statement to police and stated that the defendant actually borrowed clothes from her on May 4, 2000. The defendant told her that the victim "was going to help her [and] give her money to get back on her feet." She acknowledged that the victim had wired $25 to her to give to the defendant.

Bill Lewis, the defendant's ex-boyfriend and father of her child, testified that in early May 2000, the defendant borrowed some money on a Tuesday for a bond for Eric Sullivan. The defendant and Sullivan came to his house on Wednesday and stayed until about 11:00 p.m. He did not see the defendant again until she returned a week later. At that time, the defendant's hair was short and she had dyed it a "burgundy red color." The defendant called Lewis from Florida on a Monday, and he told her that the Warren County Sheriff's Department wanted to talk to him and that she needed to return to Warren County and talk to them as well. He then wired her some money to a grocery store in Winter Haven, Florida. She arrived back in Tennessee on a Wednesday morning and told Lewis to "go see them [the police] first and see what they wanted." At first, the defendant told Lewis that "she didn't do it," and asked if the victim's body was found near his trailer. Later, she told Lewis that "[Sullivan] was going to protect her or something." Lewis took the defendant to talk to the police on Thursday; afterwards, she said she wanted to put four new tires on her car because "her car was down at [the victim's]." Lewis then had four new tires put on the car at a tire shop. Although he paid the disposal fee for the old tires to the shop, he took the tires at the defendant's request and dumped them on the side of the Old City Dump Road. Lewis identified a lug wrench in court, saying it looked like the one he had seen in the defendant's car. He also recalled the victim's relationship with the defendant, saying he "figured that [the victim] was her sugar daddy." About five or six years before, the defendant "had a couple of friends named Angie and John that talked about if [the victim] ever got robbed that they would have to hit him in the head to rob him." Lewis acknowledged that he was not truthful in his first statement to the police but said he was truthful in his second statement.

-4-

Dr. John E. Gerber testified that he performed the autopsy on the victim's body.  He determined that the cause of death was "multiple blunt force injuries to the head" and concluded that it was a homicide.  He described in detail the various lacerations, hemorrhages, and fractures on the victim's head and skull and stated that the wounds were consistent with having been caused by the tire tool recovered in this case.  He said the victim had no drugs in his system, and his blood-alcohol content was  .01% which was "a very small amount."

Investigator Tommy Myers of the Warren County Sheriff's Department reviewed the defendant's initial videotaped statement and re-interviewed her, along with Melissa Knowles, on May 12, 2000.  The defendant waived her <u>Miranda</u> rights and gave a handwritten statement to Myers.  He read the entire statement, in which the defendant admitted going to the victim's house with Andy Allen, whom she said killed the victim:

> I Margie Farley am making this statement of my own free will and no one has forced me to say anything in this statement.
>
> On Thursday May 4, 2000 I was with a friend & we went to Melissa's house to pick up some clothes that I could wear that she no longer wanted.  I told her that I wanted to leave town for a while to get my life together.  We left there and went to Phillip Smith's house and I took a shower.  We left there and I dropped my friend off and found out that Andy Allen was looking for me, wanted to talk he said.  I went there, met him & we left to go riding around & he was low of cash & so was I & I told him that I had a sugar daddy in McMinniville [sic] that I could get some cash from.  We arrived at [the victim's] at around 8:30 or 9:00 maybe later.  I walked up & knocked on the door and [the victim] came to the door & opened it, he was drinking & he hugged me & said where have you been you beautiful Bitch.  He asked if I needed ciggarettes [sic] and I said yes[.]  He said do you want me to go with you to Delore's Market to get some cigarettes and I said no just give me some money because Delore's is closed and I will drive up to Exxon and get some.  I knew that Andy was in the car with me and I didn't want [the victim] to see him.  [The victim] then asked if I wanted to ride to a bar and I said yes get some shoes on & I will go out to the car & straighten it up & move my clothes brush & hair spray out of the seat because I needed to tell Andy what he wanted to do, so I walked to the car and told Andy that he wanted to go to the bar but we would just tell [the victim] that we were cousins or something and it would be alright.  Andy then said "Hell no" I will not watch that old Bastard put his hands all over you.  I said wait at the church for me and I will make an excuse to leave early & he said he would so he got out of the car like he was going to walk to the church.  I went back in to the trailer

and told [the victim] that I was ready & he said he was too so as we started out the door he told me to go first because he always wanted to make sure that the doors was locked. As we started to my car I was about 5 feet ahead of him & the next thing I remember [the victim] was yelling & I looked around & Andy was hitting him in the head with something and he just kept hitting him. I was shocked, scared & terrified of all that was happening & I was yelling stop it you're killing him. Andy then stopped and took the wallet out of his pants ([the victim's])[.] He yelled let's go, let's go now so I panicked & got in the car & started out to the roadway & from there Andy disposed of the wallet & weapon. I then drove where I was told to drive until he disposed of the clothes he was wearing & from there I took him home & left for Florida.

The friend I spoke of that was with me earlier before at Phillip's was Erick Sulluvan [sic].

Myers and the other investigators "wanted to believe" what the defendant was telling them and wanted to "give her the benefit of the doubt." The defendant agreed to cooperate with the investigators and wore a body wire in an effort to tape-record Andy Allen talking about the victim's death; however, after two or three attempts, they were unable to find Allen. After talking among themselves and comparing notes, the investigators realized there were "some things in [the defendant's statement] that were not true." Myers told the defendant they "believed that she wasn't being truthful" concerning who was with her at the victim's trailer. The defendant then told the investigators "that everything in the statement was true except for a few things. One, that Andy Allen was not with her, but it was Eric Sullivan." Additionally, she stated that "when [Sullivan] was hitting [the victim] over the head that he told her to grab the wallet, which she did." The defendant said they drove toward McMinnville when they left the victim's residence, and Sullivan threw the tire tool and the victim's wallet out the window. Sullivan also threw out his bandana because "he thought it may have some of [the victim's] blood on it." At that time, the defendant also told them about Bill Lewis buying new tires for her car because she "was afraid that [the police] would track some tire prints to her car." The investigators then questioned Lewis again, and he told them that the first statement he had given was not true and that the defendant "had asked him to lie for her." Lewis took the investigators to where the old tires were dumped, and the investigators recovered the four tires. Myers reviewed his notes and testified that the defendant told him that she and Sullivan went to the victim's trailer "because they needed some money to go to Georgia to sell dope that [Sullivan] had with him." In addition, the defendant "said that she had taken her car and cleaned the carpet with brick acid to remove any blood stains." These admissions were not part of the defendant's written statement because, as the investigators were attempting to get a corrected statement from the defendant, "[s]he just became irate and cussed . . . and said she was not going to sign anything." The investigators arrested the defendant and began looking for Eric Sullivan.

On cross-examination, Myers stated that he did not videotape any of his interviews with the defendant. Even though there was videotaping equipment at the White County Jail where the defendant was interviewed, Myers stated he had "never been trained" to videotape an interview, had never videotaped an interview, and his department did not have the money for such equipment. Myers stated he "just didn't think about it." On redirect, he recalled that the defendant, in her last interview with him, stated that she kept the tire tool behind her seat in the car for protection.

The defendant testified that she met the victim through mutual friends, Johnny and Angie Nunley, and they had a "relationship" during those times when she and Bill Lewis were having problems. She and the victim often "drank a lot" when they were together. Even when they were not dating, they were friends and the victim helped the defendant financially.

She said that Andy Allen was an ex-boyfriend whom she dated in 1986. She first met Eric Sullivan at Allen's trailer in Sparta in April 2000. Allen and the defendant were both using methamphetamine at the time, and Sullivan was both a methamphetamine user and "cook." When she first met Sullivan, he and Allen, along with several other men, were cooking methamphetamine at Allen's trailer. She explained that methamphetamine is addictive and "keeps you awake . . . causes you to be disillusional [sic] . . . makes you very paranoid and very jittery." The defendant started using methamphetamine about a month before she met Sullivan. The defendant had never seen Sullivan show any violent tendencies before the victim's murder.

The defendant said that on the day of the murder, Sullivan had finished a batch of methamphetamine, and they went to Phillip Smith's house where Sullivan gave Smith "a couple of grams or so" of methamphetamine. They returned later in the day, and after Sullivan discovered that Smith did not have the money for the methamphetamine, he became "a little irate." The defendant had already asked to take a shower at Smith's house and did so in order to "get awake" because she had "been up for a couple of days." She had called Melissa Knowles and asked her to bring some clothes because it was her intention to spend the night with the victim in McMinnville. Sullivan rode with the defendant to McMinnville because "[h]e had some friends down here in McMinnville that he could stay with, and he said that he was going to Georgia" because his probation was about to be violated for driving the defendant's car on a revoked license. The defendant took Sullivan by his friend's house, but he did not stay because his friend was "probably doing a cook" and was being watched by the police. They then went to the victim's trailer. The victim knew that the defendant was on her way to spend the night with him, and she denied that there was any discussion between her and Sullivan about robbing the victim. The defendant's mother and Bill Lewis also were aware that she was going to see the victim.

They arrived at the victim's trailer around 10:30 or 11:00 p.m., and the defendant tried to get Sullivan to go inside, but "[h]e was just all paranoid." The defendant went to the back door and left Sullivan in the passenger's seat of the car. The tire tool was in the back floorboard because Allen and Sullivan had changed the defendant's tire a few days before. The victim answered the door in his shirt and underwear and asked, "[W]here the hell have you been[,] you beautiful bitch?" She told the victim that a friend was in the car, and the victim suggested they go to the Moose Lodge and get

her some cigarettes and drop her friend off. She then went out to the car and told Sullivan that the victim knew he was there and that he could go with them to the bar or they would give him a ride. However, Sullivan said he did not want a ride but was going to walk to a nearby pay phone and call a friend. The defendant went inside the victim's trailer as Sullivan was getting out of the car.

The defendant sat and drank most of a beer while the victim got dressed. As they were leaving, the defendant waited on the porch while the victim locked the door. They "walked off the steps together," but the defendant then walked ahead of the victim some distance. She heard the victim say "goddamn," and thought he had fallen because he had a bad hip. However, when she turned around, she saw the victim fighting with Sullivan and screamed for Sullivan to stop. She testified, "[W]hen I got [Sullivan] to stop, I bent down to see if [the victim] was okay. I was asking him if he was okay and he wasn't talking. I could hear him gurgling." Sullivan screamed for her to grab the victim's keys and wallet, but she refused. She pulled her own keys from her pocket and went to her car. As she was about to drive away, Sullivan jumped in the car, yelling, "[D]rive the fucking car, bitch. Drive the fucking car before I give you the same thing that I just gave him."

They stopped at a store, and the defendant called Bill Lewis who told her "just to calm down, just calm down and listen to [Sullivan] and I will take care of things." Sullivan threw the wallet and tire tool onto the side of the road. The defendant and Sullivan drove to Georgia and then on to Florida, and Sullivan told her that if she told anyone, he would kill her son and "cut him up and send him to [her] in pieces." When she returned to Tennessee, Lewis bought new tires for her car and cleaned the interior.

In her second statement, the defendant said Andy Allen was the murderer because "[the investigators] kept telling me that they knew that it was [Allen] that had done it" and, if she did not give them a written statement, "they couldn't protect me or my kid." She denied ever confessing to taking the victim's wallet but agreed she had taken steps to cover up the crime by changing her tires, cleaning her car, and making false statements to police.

On cross-examination, she acknowledged that she had spent time in prison after pleading guilty to aggravated kidnapping, which she had committed with her husband. She also stated that Sullivan took between $700 and $900 from the victim's wallet and that when she left the victim in his yard near his steps, he was fully dressed. She could not explain how his boots or pants had come off and said, "That has always been a mystery to me." She said she had her hair cut and dyed in Georgia the day after the murder, and Sullivan changed his appearance as well because "he was afraid the police would be looking for us." She also stated that Sullivan told her after the murder that if she "wanted to know why he did it to call [her] boyfriend [Lewis]."

**Sentencing Hearing**

The sole witness at the sentencing hearing was Donna Dunlap, the defendant's probation officer who prepared the presentence report. She testified concerning the defendant's criminal record, which included a pending assault on a police officer charge in Warren County and a violation

of an order of protection in 2000. She also had an additional assault conviction and convictions for aggravated kidnapping and three counts of forgery. Additionally, although the offense is not identified in the presentence report, the defendant had a conviction in 1990 for firing a missile into a dwelling. She also stated that the defendant was on parole three times but violated it each time. While in prison, the defendant had obtained her G.E.D., and she told Dunlap that she had completed "anger management and sex abuse and stress management and substance abuse programs." The defendant also told Dunlap that she began using alcohol and Valium when she was twelve and started using cocaine at the age of fourteen, which she used three or four times a week. In addition, she started using methamphetamine right before the victim's murder and was using methamphetamine at the time of the murder.

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant argues that the evidence was insufficient to support either her conviction for facilitation of felony murder or facilitation of especially aggravated robbery. The State disagrees.

In considering this issue, we apply the familiar rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a

defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

## Facilitation of Felony Murder

The defendant's argument essentially is that because she was not convicted of an offense listed in Tennessee Code Annotated section 39-13-202, i.e., robbery or attempted robbery, then her conviction for facilitation of felony murder cannot stand, and "facilitation [of especially aggravated robbery] would not constitute an underlying felony necessary to establish the crime of felony murder." As we understand, the defendant argues that the guilty verdicts returned by the jury were inconsistent in that in order to facilitate felony murder, she would also have to be found guilty of either robbery or attempted robbery.

Facilitation of felony murder requires proof that:

1.  One of the felonies listed in Tenn. Code Ann. § 39-13-202(a)(2) or (3) was committed;

2.  The victim was killed during the commission of that offense;

3.  The defendant knew that another person intended to commit the underlying felony, but he or she did not have the intent to promote or assist the commission of the offense or to benefit in the proceeds or results of the offense; and

4.  The defendant knowingly furnished substantial assistance to that person in the commission of the underlying felony.

See State v. Ely, 48 S.W.3d 710, 719-20 (Tenn. 2001); Tenn. Code Ann. §§ 39-11-403(a), 39-13-202(a)(2)-(3) (2003); see also State v. Pharez Price, No. M2002-01717-CCA-R3-CD, 2003 WL 1868653, at *8 (Tenn. Crim. App. Apr. 11, 2003), perm. to appeal denied (Tenn. Oct. 13, 2003); State v. Marthias S. Phillips, No. M2000-02575-CCA-R3-CD, 2002 WL 31202125, at *5 (Tenn. Crim. App. Sept. 27, 2002), perm. to appeal denied (Tenn. Jan. 27, 2003).

In the present appeal, especially aggravated robbery, rather than facilitation of especially aggravated robbery, was the underlying felony supporting the facilitation of felony murder conviction. The jury's verdicts, finding the defendant guilty of facilitation of felony murder and facilitation of especially aggravated robbery, obviously reflected its belief that Sullivan killed the victim while committing an especially aggravated robbery and that Sullivan took the victim's wallet. Moreover, the verdicts reflect that the jury believed the defendant knew the robbery was going to occur and furnished substantial assistance to Sullivan, who committed the underlying offenses of especially aggravated robbery and felony murder. The two verdicts are entirely consistent. The defendant did not strike the victim with the tire tool or rob him, nor did her conduct rise to the level of criminal responsibility as set forth in Tennessee Code Annotated section 39-11-402. The jury

rejected the crime charged, felony murder, in favor of the lesser-included offense, facilitation of felony murder, which we have stated is both "a prerogative that the jury has under our system of justice and a right to which an accused is entitled." State v. Hicks, 835 S.W.2d 32, 36 (Tenn. Crim. App. 1992). Accordingly, this issue is without merit.

## Facilitation of Especially Aggravated Robbery

The defendant argues that the evidence was insufficient to support her conviction for facilitation of especially aggravated robbery because the evidence at trial showed that "the property that was taken from the person of the victim was not connected to the homicide" and that only a theft occurred because the "taking was done after the death of the victim." We will review these arguments.

Robbery is the "intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a) (2003). Especially aggravated robbery is a robbery accomplished with a deadly weapon and where the victim suffers serious bodily injury. Tenn. Code Ann. § 39-13-403(a) (2003). Facilitation, as previously discussed, requires that a defendant, without intent to promote or assist in the commission of the robbery or benefit in the proceeds, knowingly furnish substantial assistance in the commission of the robbery and that the defendant knew the other person intended to commit the robbery. Tenn. Code Ann. § 39-11-403(a) (2003).

Proof at trial established that Sullivan struck the victim in the head multiple times with a tire tool, resulting in the death of the victim. Contemporaneous with the murder, the victim's wallet was taken from his pants. The State's theory at trial, in fact, was that the victim's pants literally were pulled from his body in an effort to get his wallet from the pants. Clearly, the victim, who suffered serious bodily injury leading to death, was robbed of his wallet and money and this was accomplished with a deadly weapon, namely a tire tool. Subsequently, Sullivan took $700 to $900 from the wallet. While the defendant testified at trial that Sullivan took the wallet from the victim's pants, at one point she had admitted to the police that it was she who took the wallet from the victim's pants. The jury's verdict obviously reflected a belief that the defendant may not have physically taken the victim's wallet, but she nonetheless knowingly furnished substantial assistance in the commission of the robbery, a determination which is supported by the evidence. She was present during the robbery and murder, drove her codefendant from the scene to Florida, changed her appearance the day after the crime, helped spend the victim's money during her trip, had her car cleaned and tires changed in an effort to conceal the crime, asked friends to lie and provide alibis, and gave at least three different stories to the police. We conclude that the evidence is sufficient to support this conviction.

Finally, the defendant's convictions will stand regardless of the outcome of the trial of her codefendant, Eric Sullivan. By virtue of Tennessee Code Annotated section 39-11-407, the outcome of the codefendant's trial cannot benefit this defendant:

-11-

> In a prosecution in which a person's criminal responsibility is based upon the conduct of another, the person may be convicted on proof of commission of the offense and that the person was a party to or facilitated its commission, and it is no defense that . . . [t]he person for whose conduct the defendant is criminally responsible has been acquitted, has not been prosecuted or convicted, has been convicted of a different offense or different type or class of offense, or is immune from prosecution.

Tenn. Code Ann. § 39-11-407 (2003). In sum, the defendant's convictions for facilitation of especially aggravated robbery and facilitation of felony murder, two distinct and separate crimes, can stand independently regardless of whether Eric Sullivan is convicted or acquitted, or never prosecuted at all, for the underlying crimes of especially aggravated robbery and felony murder.

## II. Jury Instruction as to Accessory After the Fact

The defendant asserts that the trial court erred in not including an instruction on accessory after the fact as a lesser-included offense of each of the charged crimes in its jury instructions. Acknowledging the holdings of this court in State v. Hodgkinson, 778 S.W.2d 54 (Tenn. Crim. App. 1989), and State v. Hoosier, 631 S.W.2d 474 (Tenn. Crim. App. 1982), the defendant notes that each concludes an accessory after the fact instruction need be given only if the defendant is charged in a separate count with accessory after the fact. She asserts, however, that those cases "involved facts that are at odds with the facts presented in this case" and that the facts of the present case "established the elements of accessory after the fact." We respectfully disagree that the facts of the present appeal justify our not applying the holdings in those cases. This court has consistently held that accessory after the fact, as defined in Tennessee Code Annotated section 39-11-411, is a separate and distinct offense, rather than a lesser-included offense. See Hodgkinson, 778 S.W.2d at 63; Hoosier, 631 S.W.2d at 476. Moreover, this court has concluded that the landmark case dealing with lesser-included offenses, State v. Burns, 6 S.W.3d 453 (Tenn. 1999), and its analysis do not change the traditional view that accessory after the fact is a separate and distinct offense from the substantive offense. See State v. Joel M. Puentes, No. M2001-01115-CCA-R3-CD, 2002 WL 127366, at *4 (Tenn. Crim. App. Feb. 1, 2002); State v. Jon Robert Goodale, No. M2000-02140-CCA-R3-CD, 2001 WL 1077965, at **4-5 (Tenn. Crim. App. Sept. 14, 2001), perm. to appeal denied (Tenn. Feb. 19, 2002). The defendant was not charged in the indictment with accessory after the fact; and, accordingly, it was not error when the jury was not instructed on this offense.

## III. Sentencing

The trial court imposed consecutive sentences based on two of the criteria set forth in Tennessee Code Annotated section 40-35-115, namely that the defendant was a professional criminal who has knowingly devoted her life to criminal acts as a major source of livelihood and her record of criminal activity is extensive. She admits the existence and applicability of an extensive criminal record but disputes that the record supports the trial court's determination that she devoted her life to criminal acts as a major source of livelihood. Additionally, she asserts that consecutive sentences

are not permitted under Tennessee Code Annotated section 40-35-115 if only one of the criteria is applicable. The State disagrees.

When an accused challenges the length, range, or manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In conducting a *de novo* review of a sentence, this court must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancing factors, (g) any statements made by the accused in his own behalf, and (h) the accused's potential or lack of potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-103, -210.

The party challenging the sentences imposed by the trial court has the burden of establishing that the sentences are erroneous. See Tenn. Code Ann. § 40-35-401, Sentencing Commission Cmts.; see also Ashby, 823 S.W.2d at 169.

The Tennessee Criminal Sentencing Reform Act of 1989, enacted to "promote justice," Tenn. Code Ann. § 40-35-102 (2003), provides that the sentence imposed upon an offender should be the "least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(4) (2003).

A trial court may order that the sentences of a defendant convicted of multiple offenses be served consecutively if any one of the statutory criteria in Tennessee Code Annotated section 40-35-115 is met. These considerations are set out in the alternative with the disjunctive "or"; therefore, only one of the criteria need be met in order for the trial court to impose consecutive sentences. The defendant admits she has an extensive criminal record. That alone supports the imposition of consecutive sentences. According to the presentence report summary, the defendant's numerous incarcerations resulted in her having a spotty work record:

> [The defendant] has a very limited work history since most of her adult life has been spent in the prison system. While in prison she has been on the work release program and worked on the landscaping crew. She stated she also helped Bill Lewis in his roofing business but this was not verified. She stated she did work for LTD out of Smithville for about one year but due to surgery quit that job. In September, 1990, [the defendant] was arrested, along with her husband, Paul Farley, for aggravated kidnapping and robbery. She received a twelve year sentence for this and served this in the women's prison in Davidson County. She was paroled on June 8, 1993. She violated her parole by obtaining a new charge of possession of marijuana on Feb. 14, 1994. Her parole was revoked on March 21, 1994 and she was returned to

-13-

prison. She was paroled again on September 18, 1995. Once again she violated her parole on December 8, 1995 by testing positive for cocaine on a drug screen. Her parole was revoked on January 23, 1996. [The defendant] was paroled again on February 24, 1997. On November 3, 1997 [she] tested positive for cocaine and this violated her parole. Her parole was revoked on December 2, 1997 and she was returned to prison. Her sentence expired on April 26, 1999.

The presentence report also indicates the defendant has the following prior criminal history: an assault charge in 2001; violation of an order of protection in 2000; a misdemeanor assault conviction in 1999; an aggravated kidnapping conviction in 1991; and a felony forgery conviction in 1990. The trial court need only find the presence of any one of these criteria "by a preponderance of the evidence." Tenn. Code Ann. § 40-35-115(b) (2003). The defendant's lengthy record of convictions shows that she has been active in committing crimes, but not the extent to which she supported herself by these acts during the periods she was not incarcerated. However, even if the trial court erred in determining that she was a professional criminal, the defendant's numerous convictions justify consecutive sentencing.

## CONCLUSION

Based on the foregoing authorities and reasoning, the judgments of the trial court are affirmed. However, we note that the judgments list differing offense dates, with the two which are the basis for this appeal listing May 7, 2000, as the offense date, while that of criminally negligent homicide, which was merged with the conviction for facilitation of felony murder, bears May 5, 2000, as the offense date. According to the proof, the offenses occurred on May 4-5, 2000, and we remand for entry of corrected judgments reflecting this date.

_____
ALAN E. GLENN, JUDGE

-14-